United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Motaz Dr. Al-Hafnawi, Plaintiff, <br><br> v. <br><br> The Public Health Trust of Miami-Dade County, Florida, doing business as Jackson Memorial Hospital, Defendant. | Civil Action No. 19-20904-Civ-Scola |

### Order Granting the Defendant's Motion for Summary Judgment

Plaintiff Motaz Dr. Al-Hafnawi, who describes himself as a Muslim of Arab ancestry and Jordanian national origin, seeks to recover damages against Defendant The Public Health Trust of Miami-Dade County, Florida, doing business as Jackson Memorial Hospital (the "Trust" or the "Hospital"), for discrimination and retaliation. (Am. Compl. ¶ 1, ECF No. 34.) Dr. Al-Hafnawi alleges the Hospital discriminated against him, harassed him, and forced him to endure a hostile work environment because of his religion, race, ancestry, and national origin. (*Id.*) The five counts in his complaint arise under Title VII of the Civil Rights Act (counts one and three), the Florida Civil Rights Act (count two and four), and 42 U.S.C. § 1981 (count five). The Trust has moved for summary judgment on all five counts, arguing, among other things, Dr. Al-Hafnawi has failed to establish a prima facie case on any basis and has, further, failed to establish that the Hospital's legitimate, non-discriminatory reasons for Dr. Al-Hafnawi's termination are a pretext for discrimination or retaliation. (Def.'s Mot., ECF No. 46.) Dr. Al-Hafnawi sought an extension of time to respond to the Trust's motion which the Court denied. (Paperless Order, ECF No. 49.) After the deadline for Dr. Al-Hafnawi to file his opposition had passed without his having responded, the Court entered an order for him to show cause why the Court should not consider the Trust's motion without the benefit of his response. (Paperless Order, ECF No. 50.) Dr. Al-Hafnawi's response to the order to show cause was insufficient to discharge the order to show cause. (Pl.'s Resp., ECF No. 51.) Within his response, Dr. Al-Hafnawi also renewed his request for an extension of time to file his opposition to the Trust's motion. The Court denied the request, finding it procedurally flawed and substantively lacking. (Paperless Order, ECF No. 52.) The Court has therefore considered the Trust's motion without the benefit of a response from Dr. Al-Hafnawi. After careful review, the Court agrees with the Hospital that Dr. Al-Hafnawi has not set forth a prima

facie case of discrimination or retaliation on any basis and therefore **grants** its motion, in its entirety, on that basis (**ECF No. 46**).

1. **Facts**[1]

    A. **Dr. Al-Hafnawi's Background and Employment History with the Jackson Health System**

    The Public Health Trust of Miami-Dade County operates the Jackson Health System. (Def.'s Stmt. of Facts ¶ 1, ECF No. 47.) The Jackson Health System is, in turn, made up of several facilities, including Jackson Memorial Hospital, Jackson North Medical Center, and Jackson South Medical Center. (*Id.*) The Jackson Health System is also comprised of numerous departments with operations across some or all the facilities, including Jackson Medical Group/Physician Services which employs physicians throughout the Jackson Health System. (*Id.*) Within the medical group are numerous medical specialties, including gastroenterology, where Dr. Al-Hafnawi was employed from 2016 to 2018. (*Id.*)

    Dr. Al-Hafnawi identifies himself as a Caucasian, Arabic male, born in Jordan, and a Muslim who follows the religion of Islam. (*Id.* at ¶ 2.)

    Dr. Al-Hafnawi's employment within the Jackson health system began in 2009, when Dr. Al-Hafnawi was hired as a one-year hepatology fellow. (*Id.* at ¶ 3.) Following that, in 2010, Dr. Al-Hafnawi was hired as a full-time attending physician/hospitalist assigned to the Hospital. (*Id.*) Dr. Al-Hafnawi voluntarily resigned in 2013. (*Id.*)

    Some three years later, Dr. Al-Hafnawi returned to the Jackson health System as an associate medical director/gastroenterologist with the Jackson Medical Group at Jackson South, with a starting salary of $400,000. (*Id.* at ¶ 4.) Dr. Al-Hafnawi's employment agreement was for a two-year term, but also provided that he could be terminated earlier "without cause," as follows:

    > 2. **TERM.**
    > The Term of this Agreement will start on the Effective Date, and will remain in effect for a period of two . . . years unless either the PHYSICIAN or the TRUST terminate this Agreement earlier, as permitted in Article 5 of this Agreement. Upon expiration, this Agreement will automatically extend for an additional one-year

---

[1] Although Dr. Al-Hafnawi has not submitted any opposition to the Hospital's statement of undisputed facts, the "[C]ourt must still review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009). The Court has reviewed the Hospital's record citations and sets forth the facts accordingly, as follows.

> term, unless terminated as permitted in Article 5 of this Agreement.
>
> . . .
>
> **5.2 Termination Without Cause**. This Agreement and the PHYSICIAN's employment hereunder shall automatically terminate "without cause" upon the occurrence of one or more of the following events:
>
> 5.2.1 The TRUST may terminate this Agreement without cause by providing at least ninety . . . days ("TRUST Notice Period") prior written notice to the PHYSICIAN. The PHYSICIAN may terminate this Agreement without cause by providing at [least] ninety (90) days ("PHYSICIAN Notice Period") prior written notice to the TRUST. If the TRUST terminates this Agreement under subsection 5.2.1, the PHYSICIAN shall continue to perform pursuant to this Agreement throughout the TRUST Notice Period and the TRUST will pay the PHYSICIAN for services rendered during the TRUST Notice Period. If the TRUST elects, in its sole discretion, to release the PHYSICIAN from scheduled work hours for some or all of the TRUST Notice Period, the TRUST shall pay the PHYSICIAN for the remainder of the TRUST notice Period after the PHYSICIAN was released from schedule work hours in the amount corresponding to the PHYSICIAN's compensation for such time period.
>
> . . .
>
> 5.3 Obligations upon Termination. Each Party shall continue to perform its obligations hereunder through the termination date and TRUST shall pay the PHYSICIAN for such performance in accordance with this Agreement. After the termination date, the PHYSICIAN agrees that it shall cease all activities related to performance of services under this Agreement . . .

(*Id.* at ¶ 5.)

In June 2018, Alejandro Contreras, the senior vice president of systems operations for the Jackson Health System, presented Dr. Al-Hafnawi with a letter notifying him that his employment was being terminated by the president and CEO of Jackson Health System, Carlos Migoya. (Id. at ¶ 7.) The letter advised Dr. Al-Hafnawi as follows:

> Pursuant to Section 2 and Section 5.2 of the Employment Agreement, the Trust has elected not to renew your Employment Agreement and through this letter is providing you with 90 days' notice of its intent to terminate the Employment Agreement upon the conclusion of the two (2) year . . . term . . . on October 16th, 2018. The Trust will compensate you in accordance with the terms

> of the Employment Agreement throughout the remainder of the term of [the] Agreement.

(*Id.*) Several days after being given the letter, on July 13, 2018, Dr. Al-Hafnawi was told to turn in his badge and leave the premises. (*Id.* at ¶ 8.) As provided for in his employment agreement, Dr. Al-Hafnawi was paid his full salary through the end of his contract term, October 16, 2018. (*Id.*)

### B. Dr. Al-Hafnawi's Supervisor

As provided for in Dr. Al-Hafnawi's employment agreement, Dr. Al-Hafnawi's supervisor was Dr. Robert Heros, the chief medical officer of Jackson's Medical Group:

> **3.3. PHYSICIAN Assignment and Supervision.**
>
> The Physician will be a full-time classified exempt employee of the TRUST during the term of this Agreement. The PHYSICIAN will report to and be under the supervision of the Chief Medical Officer assigned to the TRUST'S Physician Services Department or another individual whom the TRUST designates.

(*Id.* at ¶ 9.) In his complaint, Dr. Al-Hafnawi directs many of his allegations against Dr. Orlando Rodriguez. Dr. Rodriguez, however, was not an employee of the Public Health Trust or affiliated with the Jackson Medical Group from 2016 through 2018. (*Id.* at ¶ 10.) Indeed, at all relevant times, Contreras was responsible for all Jackson Medical Group-employed physicians throughout the Jackson Health System—including Dr. Al-Hafnawi. (*Id.* at ¶ 11.)

### C. Dr. Al-Hafnawi's Termination and Jackson Health System's Work Environment

In terminating, Dr. Al-Hafnawi, Contreras maintains he relied on the "termination without cause" provision of Dr. Al-Hafnawi's employment contract. (*Id.* at ¶ 13.) Additionally, Contreras was aware of issues with Dr. Al-Hafnawi's performance and lack of consistent productivity. (*Id.* at ¶ 14.) Contreras also said that issues were brought to his attention related to Dr. Al-Hafnawi's engaging in disruptive behaviors and failing to get along and work cooperatively with his colleagues. (*Id.*) Contreras determined that these issues had a negative impact on the workplace environment. (*Id.*) In concluding Dr. Al-Hafnawi's future practice was not sustainable, Contreras noted Dr. Al-Hafnawi was unable to establish relationships with referral sources in the community which was reflected in Dr. Al-Hafnawi's marginal productivity. (*Id.*)

Prior to his termination, Dr. Al-Hafnawi was subjected to peer review charges and questioning. (*Id.* at ¶ 16.) Dr. Al-Hafnawi acknowledged, during his

deposition, that other non-Muslim, non-Arabic, non-Jordanian doctors were also subjected to similar peer-review proceedings. (*Id.*) Dr. Al-Hafnawi additionally named three other doctors who were terminated, none of whom were identified as either Muslim, Arabic, or Jordanian. (*Id.*) Further, the Trust has retained numerous physicians throughout the Jackson Health System who are Arabic or Muslim. (*Id.* at ¶ 18)

Dr. Al-Hafnawi testified that Dr. Rodriguez referred to him as "this Arab guy" during a phone conversation while also acknowledging that using the word "Arab," without more, is not objectively offensive. (*Id.* at ¶ 22.) Dr. Al-Hafnawi did not recall Dr. Rodriguez's having ever directed comments towards him about his religion. (*Id.* at ¶ 23.) The only comment Dr. Al-Hafnawi recalled regarding his religion was when a member of his staff told him that she had heard other staff members "talking about [his] religion and not in a good way" while Dr. Al-Hafnawi was praying inside his office. (*Id.*) Dr. Al-Hafnawi acknowledged, though, that these statements did not interfere with his ability to do his job. (*Id.* at ¶ 24.)

While Dr. Al-Hafnawi worked at the Hospital, physicians were generally required to be on call every three months for seven nights in a row. (*Id.* at ¶ 26.) During the Islamic holy month of Ramadan, Dr. Al-Hafnawi was fasting during the day and did not want to perform any on-call duties at night. (*Id.* at ¶ 27.) As Dr. Al-Hafnawi explained, he felt he would be too exhausted to work at night, after fasting all day. (*Id.*) One week during Ramadan, in May 2018, the Hospital needed someone to cover the call schedule and Dr. Al-Hafnawi was ordered to do so. (*Id.* at ¶28.) When Dr. Al-Hafnawi had worked the on-call night shift in 2010, however, he acknowledged it was possible to do so while still observing Ramadan. (*Id.* at ¶ 29.)

Dr. Al-Hafnawi testified that he discussed complaints about race and patient care with Cecilia Gonzalez, the chief of human resources at Jackson South, in December 2017 or January 2018. (*Id.* at ¶ 33.) Five months later, in June, Contreras terminated him. (*Id.* 34.) Dr. Al-Hafnawi did not file his Equal Employment Opportunity Commission charge, which only asserts national origin and religious discrimination, until August 6, 2018, well over a month after his termination. (*Id.* at ¶¶ 31, 35.) Contreras, at the time he terminated Dr. Al-Hafnawi, was not aware of any complaints Dr. Al-Hafnawi had made to anyone at the Trust that he was being harassed or discriminated against because of his race, national origin, or religion. (*Id.* at ¶ 32.)

## 2. Legal Standard

Under Federal Rule of Civil Procedure 56, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the

moving party is 'entitled to a judgment as a matter of law.'" *See Alabama v. N. Carolina*, 130 S. Ct. 2295, 2308 (2010) (quoting Fed. R. Civ. P. 56(a)). At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmovant, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970), and it may not weigh conflicting evidence to resolve disputed factual issues, *see Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007). Yet, the existence of some factual disputes between litigants will not defeat an otherwise properly grounded summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the record as a whole could not lead a rational trier of fact to find in the nonmovant's favor, there is no genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[O]nce the moving party has met its burden of showing a basis for the motion, the nonmoving party is required to 'go beyond the pleadings' and present competent evidence designating 'specific facts showing that there is a genuine issue for trial.'" *United States v. $183,791.00*, 391 F. App'x 791, 794 (11th Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but [instead] must set forth specific facts showing that there is a genuine issue for trial." *See Anderson*, 477 U.S. at 248 (citation omitted). "Likewise, a [nonmovant] cannot defeat summary judgment by relying upon conclusory assertions." *Maddox-Jones v. Bd. of Regents of Univ. of Ga.*, 2011 WL 5903518, at *2 (11th Cir. Nov. 22, 2011). Mere "metaphysical doubt as to the material facts" will not suffice. *Matsushita*, 475 U.S. at 586.

### 3. Analysis

#### A. The Trust is entitled to summary judgment on Dr. Al-Hafnawi's discrimination and harassment claims.

In counts one and two, Dr. Al-Hafnawi alleges the Hospital harassed and discriminated against him under Title VII of the Civil Rights Act and the FCRA (respectively), terminating his employment on the basis of his religion, race, and national origin. A plaintiff may carry the burden of proving that his employer intentionally discriminated against him, under either statute, in a number of ways.[2] One way is to rely on the three-step burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). "A plaintiff can also present direct evidence of discriminatory intent or demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of

---

[2] *Johnson v. Miami-Dade County*, 948 F.3d 1318, 1325 (11th Cir. 2020) ("[B]ecause the FCRA is based on Title VII, decisions construing Title VII apply to the analysis of FCRA claims.").

intentional discrimination." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1221 (11th Cir. 2019) (quotations and citations omitted).

**(1) Dr. Al-Hafnawi has failed to establish a prima facie case of discrimination based on race, national origin, or religion under Title VII and the Florida Civil Rights Act.**

Under Title VII of the Civil Rights Act, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

To the extent Dr. Al-Hafnawi attempts to maintain his claims based on circumstantial evidence, he must carry the initial burden of establishing a prima facie case of discrimination by showing (1) he belongs to a protected class; (2) he was qualified to do the job; (3) he was subjected to an adverse employment action; and (4) his employer treated similarly situated employees outside his class more favorably. *Lewis*, 918 F.3d at 1220–21. Dr. Al-Hafnawi has not satisfied the fourth prong because he has failed to show the Hospital treated similarly situated employees outside of his class more favorably.

To satisfy this fourth prong, a "comparator" must be similarly situated to the plaintiff "in all material respects." *Id.* at 1224. Although what constitutes a "material" similarity or difference will differ from case to case, a similarly situated comparator generally will have: (1) engaged in the same basic conduct (or misconduct) as the plaintiff; (2) been subject to the same employment policy, guideline, or rule as the plaintiff; (3) been under the jurisdiction of the same supervisor as the plaintiff; and (4) shared the plaintiff's employment or disciplinary history. *Id.* at 1227–28. "[A] valid comparison will turn not on formal labels, but rather on substantive likenesses." *Lewis*, 918 F.3d at 1228. That is, "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* (quoting *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1355 (2015)). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *McQueen v. Alabama Dep't of Transportation*, 769 F. App'x 816, 822 (11th Cir. 2019) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).

Here, it is undisputed the Hospital decided not to renew Dr. Al-Hafnawi's written employment agreement under the "termination without cause" provisions of the contract. (Def. Stmt. at ¶¶ 5–8, 12–14.) Further, prior to his separation, Dr. Al-Hafnawi engaged in ongoing disruptive behaviors and failed to get along and work cooperatively with his colleagues, which had a negative impact on the workplace environment. (*Id.* at ¶ 14.) Dr. Al-Hafnawi has failed to

identify a single doctor outside his protected categories within the Jackson Medical Group who worked for the same supervisors as he did, during the same time frame, who had the same type of patient care complaints and ongoing disruptive behaviors, inability to get along and work cooperatively with his colleagues, and marginal productivity, and whose employment contract was not terminated. In fact, Dr. Al-Hafnawi admits that non-Muslim, non-Arabic, non-Jordanian, and Hispanic doctors have been brought up on peer review, have had workplace disputes with Dr. Rodriguez, and were also terminated. (*Id.* ¶ 16.) Moreover, Contreras confirmed that, under his leadership, the Jackson Health System has terminated numerous other physicians throughout the health system who were not Arabic or Muslim, and it has, at the same time, retained numerous physicians who, like Dr. Al-Hafnawi, are Arabic or Muslim. (*Id.* ¶ 18.) By failing to present evidence of a viable comparator, Dr. Al-Hafnawi cannot make out the fourth prong of a prima facie case of race, national origin, or religious discrimination. *See, e.g., Mohamed v. Pub. Health Tr. of Miami-Dade Cty.*, No. 09-21235-CIV, 2010 WL 2844616, at *10 (S.D. Fla. July 19, 2010) (Altonaga, J.) (granting summary judgment to the Trust on Muslim employee's religious discrimination claim because the plaintiff "ha[d] not identified any non-Muslim comparator who was found reading a newspaper on the job who was not terminated" and therefore had "not identified a valid comparator").

Nor has Dr. Al-Hafnawi presented any direct evidence of discriminatory intent. "Direct evidence is evidence, that, if believed, proves the existence of discriminatory intent without inference or presumption." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (cleaned up).[3] As the Eleventh Circuit has explained, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Id.* at 922 (cleaned up). This direct evidence of discrimination must be "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (cleaned up). The Court has reviewed the entirety of the record presented by the Trust, including Dr. Al-Hafnawi's 180-page deposition, and finds no direct evidence of discrimination correlated to his termination.

Similarly, the record reveals no other evidence "that would allow a jury to infer intentional discrimination by the decisionmaker." *Herron-Williams v. Alabama State Univ.*, 805 F. App'x 622, 630 (11th Cir. 2020) ("Even if a plaintiff

---

[3] The Court uses (cleaned up) to indicate that internal quotation marks, alterations, or citations have been omitted from quotations. *See, e.g., Durham v. Rural/Metro Corp.*, 955 F.3d 1279, 1285 (11th Cir. 2020).

cannot produce an adequate comparator, she will survive summary judgment if she presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.") (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)); *see also Guerrero v. Miami-Dade Cty.*, No. 13-CV-21374, 2014 WL 2916447, at *4 (S.D. Fla. June 19, 2014) (Williams, J.) (finding a plaintiff failed to present "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination," where there was "no evidence that supervisors at the Property Appraiser's Office discussed [the p]laintiff's pregnancy in deciding to terminate her employment, and [the p]laintiff testified that she never heard . . . any . . . supervisors make any negative comments regarding her pregnancy").

Indeed, there is no record evidence that Contreras, the decisionmaker with respect to Dr. Al-Hafnawi's termination, had any discriminatory intent towards him or that he ever made a negative comment about his race, national origin, or religion. Nor is there any record evidence that anyone else ever made such comments in relation to Contreras's termination decision. Accordingly, Dr. Al-Hafnawi's discrimination claims cannot survive the Trust's motion for summary judgment. *See, e.g., Herron-Williams*, 805 F. App'x at 630 (noting that even though the plaintiff had "present[ed] evidence that various administrators . . . gave her a hard time . . . she has not done enough *to connect that negative treatment to her race or gender*" and therefore had not come even close to establishing a mosaic of circumstantial evidence) (emphasis added); *Williams v. Hous. Opportunities for Persons with Exceptionalities*, 777 F. App'x 451, 455 (11th Cir. 2019), *cert. denied,* 140 S. Ct. 1113 (2020) (finding that even a comment described as "evinc[ing] discriminatory animus" and "unbefitting any workplace" is not direct evidence of discrimination where the content of the statement "bears no relation to the termination decision") (citing *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1229 (11th Cir. 2002) for the proposition that "[a]lthough a comment unrelated to a termination decision may *contribute* to a circumstantial case for pretext, it will usually not be sufficient absent some additional evidence supporting a finding of pretext") (emphasis in original). Because there is no evidence that race, national origin, or religion play any role in Dr. Al-Hafnawi's termination, the Trust is entitled to summary judgment on his discrimination claims under Title VII and FCRA.

### (2) Dr. Al-Hafnawi's claim under 42 U.S.C. § 1981 is not viable.

In count five, Dr. Al-Hafnawi complains the Trust denied him "the same rights to make and enforce contracts as [are] enjoyed by white citizens, in violation of [his] rights under 42 U.S.C. § 1981." (Am. Compl. at ¶ 97.) But because the Trust is a governmental entity, Dr. Al-Hafnawi's § 1981 claim may

only be brought through the remedy provided in 42 U.S.C. § 1983. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735–36 (1989) (holding that a local government's violation of § 1981 must be proven to have resulted from a custom or policy within the meaning of *Monell*). Accordingly, Dr. Al-Hafnawi's § 1981 claim fails because he has not shown that the Miami-Dade County Board of County Commissioners endorsed, authorized or was deliberately indifferent to a policy or custom in order to sustain a *Monell* claim against the Trust. *Russell v. Pub. Health Tr. of Miami-Dade Cty.*, No. 08-23442-CIV, 2009 WL 936662, at *4 (S.D. Fla. Apr. 6, 2009) (Huck, J.) (holding that a podiatry resident could not bring her § 1983 racial discrimination claims against the Public Health Trust based on the actions of the trust's employees because "the Trust's ultimate policymaking authority [is] vested in the County Commission"); *Gonzalez v. Pub. Health Tr.*, 686 F. Supp. 898, 899 (S.D. Fla. 1988) (Hoeveler, J.) ("Regarding the issue of § 1981 liability, the court finds that [the Public Health Trust] cannot be held liable for the acts of its employees without proof a discriminatory custom or policy.").

**(3) Dr. Al-Hafnawi has failed to establish a prima facie case of a hostile work environment based on race, national origin, or religion under Title VII and the Florida Civil Rights Act.**

To establish a claim of a hostile work environment based on race, national origin, or religion, an employee must prove "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Mahone v. CSX Transportation, Inc.*, 652 F. App'x 820, 823–24 (11th Cir. 2016) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To show this, a plaintiff must satisfy the following elements: "(1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008). Based on the record evidence, Dr. Al-Hafnawi is unable satisfy the fourth element. Because of this obvious deficiency, the Court does not analyze the remaining factors.

Many of the difficulties Dr. Al-Hafnawi testified to during his deposition were not connected to Dr. Al-Hafnawi's race, national origin, or religion. Indeed, the precipitating factors of most of the incidents Dr. Al-Hafnawi described were difficult to discern at all. For example, in recounting the adversity he claimed to have endured at the Hospital, Dr. Al-Hafnawi complained that his name would

be listed as a consult when he was not actually on call. (Pl.'s Dep. 45:4–5, ECF No. 47-3, 12.) When asked to clarify, Dr. Al-Hafnawi explained:

> Patient is in the hospital. The patient is sick. They need medical attention from a gastroenterologist, either a bleeding or something needs to be addressed like within hours. So they put my name as a consult. Like I'm the one who is on call to go and see that patient. I'm not on call. They don't tell me and they wanted to create like a . . . problem with the patient care and say that this physician is not coming to see the patients. The patients are suffering. So that . . . brought us to this point.

(Pl.'s Dep. at 45:12–22.) Dr. Al-Hafnawi described similar interactions that interfered with his ability to work:

> Like, anesthesia is not available. A CRNA comes to the room. Is the patient dead yet? I can't start a procedure in the morning. The chief medical officer comes and meets with the staff. So things became very hostile. So I was being very careful. Going by the book. Everything I do it -- I mean, I smell things -- they want to just get me out with a problem. So I tried to be careful.

(*Id.* at 47:11–19.) Other difficulties at work Dr. Al-Hafnawi highlighted included not being sent an email about nominations to the medical executive committee that all his colleagues were sent and not being given a room to stay in at the hospital during a hurricane. (*Id.* at 120:9–13, 125:22–126:1.) At one point, during his deposition, when asked why he thought he was subjected to a hostile work environment, Dr. Al-Hafnawi said he believed it was because he was exposing shoddy care at the hospital. (*Id.* at 101:25–102:22, 104:5–15.) None of these incidents amounts to harassment based on a protected characteristic.

On the other hand, Dr. Al-Hafnawi described two of Dr. Al-Hafnawi's colleagues' referring to his being an "Arab guy." For example, when asked about another doctor making negative comments about his religion, Dr. Al-Hafnawi recounted occasions where he tried talking to that doctor:

> So I tried, like, nicely a couple times to talk with him and he picks up the phone and he says, what is this Arab guy coming and talking to us. So I mean, sometimes, like, I used to answer him -- I tend to my patients so I answered him and I tried to answer him and give him my answer and he just goes off and he starts, like, talking nonsense, everything, commanding, ordering. Do this. You don't know what you're doing. You're coming from this country or you're coming from outside. How come you're not listening to me? So this happened like on multiple occasions.

(*Id.* at 91:13–24.) Dr. Al-Hafnawi also described another doctor's telling one of Dr. Al-Hafnawi's patients, within earshot of everyone else in the operating room area, "I don't trust this Arab guy and I'm going to call another physician. I don't want to let him do your procedure." (*Id.* at 149:24–150:2.)

While the Court finds Dr. Al-Hafnawi's colleagues' referring to him as this "Arab guy" likely indicative of some discriminatory animus, Dr. Al-Hafnawi testified that the comments did not affect his ability to do his job. (*Id.* at 151:9–11.) Similarly, Dr. Al-Hafnawi also testified that another employee told him that office staff would comment about his praying in his office, telling him, "they're talking about your religion and not in a good way." (*Id.* at 100:12–13.) Again, though, at the same time, Dr. Al-Hafnawi acknowledged the comments about his religion did not amount to a "major impact" on his work performance. (*Id.* at 106:15–16.)

Analysis of the fourth element of a hostile-work-environment claim "includes a subjective and objective component." *Mahone*, 652 F. App'x at 823–24 (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999)) (en banc). In other words, "the employee must personally perceive the harassment as severe and pervasive, and the environment must be one that a reasonable person in the employee's position would find hostile or abusive." *Jones v. City of Lakeland*, 318 F. App'x 730, 735–36 (11th Cir. 2008). "The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Mahone*, 652 F. App'x at 823–24. In conducting the objective inquiry, the court must consider "the totality of the circumstances" including the following factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating or a mere offensive utterance; (4) and whether the conduct unreasonably interferes with the employee's job performance. *Id.* Moreover, Title VII is not a "general civility code" that makes actionable ordinary workplace "tribulations." *Id.* (citing *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1234 (11th Cir. 2006)).

In the context used, Dr. Al-Hafnawi's colleagues' referring to him as this "Arab guy" would likely be considered to rise above the level of a "mere offensive utterance" by a reasonable factfinder. Nonetheless, the record does not contain evidence that would allow a reasonable factfinder, based on the totality of the evidence, to infer either the subjective or objective components of the fourth element. To begin with, the evidence is insufficient to allow a reasonable factfinder to conclude that Dr. Al-Hafnawi personally perceived the harassment to be severe and pervasive. In fact, Dr. Al-Hafnawi testified to the contrary, maintaining his colleague's referring to him as this "Arab guy" did not affect his ability to do his job (Pl.'s Dep. at 151:9–11) and that learning that office staff

made negative comments about his religion did not have a major impact on his work performance (*id.* at 106:15–16).

Next, although Dr. Al-Hafnawi may have felt humiliated, as he testified, by his colleagues' comments, the record does not reveal conduct that is so frequent, severe, and disruptive "that a reasonable person in the employee's position would find hostile or abusive." *Jones*, 318 F. App'x at 735–36. Although arguably offensive, the record evidence shows the incidents were isolated and references to Dr. Al-Hafnawi's protected characteristics were uttered in an offhand manner. *Henderson v. Waffle House, Inc.*, 238 Fed. Appx. 499, 501 (11th Cir. 2007) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.") (cleaned up). Dr. Al-Hafnawi himself also testified that there is nothing offensive about the word "Arab" itself. (Pl.'s Dep. at 95:8–16.) There is also no evidence that the conduct described unreasonably interfered with Dr. Al-Hafnawi's employment.

The Eleventh Circuit has repeatedly held that significantly more egregious comments and conduct were insufficient to establish a hostile work environment claim based on race or religion. *See, e.g., Singleton v. Auburn Univ. Montgomery*, 520 F. App'x 844, 847–49 (11th Cir. 2013) (concluding that racist comments such as being called "Do Boy," being asked to leave a meeting of supervisors, being told to "watch [his] back" because of his race, while deplorable, were not severe or pervasive enough to create a hostile work environment); *Byrd v. Postmaster Gen.*, 582 F. App'x 787, 791 (11th Cir. 2014) (affirming summary judgment for an employer on religiously-based hostile work environment claim; co-worker's conduct of singing religious songs, quoting religious scripture, preaching, referring to postal employee as the devil, and informing employee that she would go to Hell did not create a hostile work environment under Title VII, since this conduct was not sufficiently severe and pervasive to be objectively hostile and abusive); *Alhallaq v. Radha Soami Trading, LLC*, 484 F. App'x 293, 296 (11th Cir. 2012) (affirming the district court's dismissal of religious harassment claim by a Muslim plaintiff based on allegations that included remarks to the plaintiff that she was "dirty" and that she should "go to Hell" and "burn in Hell" coupled with the playing of Christian music because it was not sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment); *Lara v. Raytheon Tech. Serv. Co., LLC*, 476 F. App'x 218, 221 (11th Cir. 2012) (finding that, while the plaintiff did suffer "unwarranted and derogatory comments about religion, there was nothing threatening or humiliating about the content of those offensive statements; they [we]re more analogous to 'mere offensive utterance[s]' that, although not suitable for work, do not rise to the level of Title VII harassment"); *MackMuhammad v. Cagle's Inc.*,

379 F. App'x 801, 805–806 (11th Cir. 2010) (per curiam) (holding that a Muslim employee was not subjected to religious harassment where his manager called him "Bin Laden" or "Muhammad-man" over the company's radio and intercom and where supervisors asked him about his religion and made comments about his religious dietary restrictions because such comments were at most "rude, insulting, and insensitive," but did not rise to the level of severe and pervasive harassment); *Alansari v. Tropic Star Seafood Inc.*, 388 F. App'x 902, 905 (11th Cir. 2010) (per curiam) (finding allegations by Muslim plaintiff, including "solicitations to go to church because 'Jesus would save' [plaintiff], other comments about his Muslim religion, and the playing of Christian music on the radio . . . may have been unwanted and even derogatory . . . but it did not rise to a threatening or humiliating level"); *Richardson v. Dougherty Cty., Ga*, 185 F. App'x 785, 790–91 (11th Cir. 2006) (per curiam) (rejecting Title VII hostile work environment claim where a supervisor referred to the plaintiff more than fifty times as "preacher man" and made comments about his religion and request for accommodation, where such conduct was not objectively severe or pervasive).

Accordingly, the Court finds the Trust entitled to summary judgment on Dr. Al-Hafnawi's claims based on a hostile work environment.

### (4) Dr. Al-Hafnawi has not established a prima facie case of religious discrimination based on a failure to accommodate.

Although Dr. Al-Hafnawi fails to specifically allege a failure to accommodate, he includes a general allegation that "Defendant refused to consider requests for reasonable religious accommodations from its Muslim employee," and that he was "forced to take call" on the night of May 30, 2018. (Def.'s Stmt. at ¶ 25; Am. Compl. at ¶¶ 44, 47). Dr. Al-Hafnawi cannot establish a prima facie case of failure to accommodate religious practices because the record evidence shows there was no conflict between his religious practice and his employment requirements, and he was not terminated for failing to cover his on-call duties.

To make out a prima facie case of religious discrimination based on a failure to accommodate, a plaintiff must establish (1) he held a bona fide religious belief that conflicted with an employment requirement; (2) he informed his employer of that belief; and (3) he was discharged for failing to comply with the conflicting employment requirement. *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1321 (11th Cir. 2007) (citing *Beadle v. Hillsborough Cty. Sheriff's Dep't*, 29 F.3d 589, 592 n. 5 (11th Cir. 1994)). Once a prima facie case is established, the burden shifts to the employer to "demonstrate that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business."

*Morrissette-Brown*, 506 F.3d at 1321 (quoting 42 U.S.C. § 2000e(j)) (cleaned up). Here, Dr. Al-Hafnawi fails to satisfy the first and third elements of the prima facie test.

During his deposition, Dr. Al-Hafnawi testified physicians were generally required to be on call every three months for seven nights in a row. (Def.'s Stmt. at ¶ 26.) During the Islamic holy month of Ramadan, however, Dr. Al-Hafnawi was fasting during the day and did not want to perform any on-call duties at night. (*Id.* at ¶ 27.) According to Dr. Al-Hafnawi, he "would be fasting all day and then . . . it's going to be exhausting to start [working] after that." (*Id.*) Dr. Al-Hafnawi said that, on May 30, 2018, the hospital needed someone to cover the call schedule and the scheduling physician "commanded" him to do it. (*Id.* at ¶ 28.) He admitted, however, that he was still able to work and observe Ramadan. (*Id.* at ¶ 29.) Dr. Al-Hafnawi, thus, fails to satisfy the first element because he has admitted that his religious fast during the day did not actually conflict with his on-call duties at night.

Finally, Dr. Al-Hafnawi also fails to satisfy the third element because it is undisputed that the Trust did not discipline Dr. Al-Hafnawi regarding his work on May 30, 2018. Indeed, Dr. Al-Hafnawi admits he was never disciplined at any time before his termination several months later. (*Id.* at ¶ 30.) Because Dr. Al-Hafnawi has failed to show any conflict between his religious practice and his work requirements on May 30, 2018, there was obviously no resulting discipline. *See Mohamed*, 2010 WL 2844616, at *6 ("Mohamed cannot establish the third prong of his *prima facie* case—that his termination resulted from his failure or inability to comply with a conflicting employment requirement because no conflict with his duties has been shown.").

Accordingly, to the extent Dr. Al-Hafnawi alleges a failure-to-accommodate claim, the Trust is entitled to summary judgment because Dr. Al-Hafnawi cannot meet his burden of establishing his prima facie case.

### B. Dr. Al-Hafnawi has failed to establish a prima facie case of retaliation under Title VII or the FCRA.

In Counts three and four, Dr. Al-Hafnawi brings a retaliation claim under Title VII and the FCRA. To establish a prima facie case of retaliation, a plaintiff must show (1) he engaged in a statutorily protected activity, (2) he suffered a materially adverse employment action, and (3) there was a causal relationship between the two events. *Johnson*, 948 F.3d at 1325 (citing *Holifield*, 115 F.3d at 1566); *Callahan v. City of Jacksonville, Fla.*, No. 19-11432, 2020 WL 914923, at *2 (11th Cir. Feb. 26, 2020). "[T]o satisfy the first element, it is sufficient that an employee have a good faith, objectively reasonable belief that his activity is protected by the statute." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328

(11th Cir. 1998). The third element requires a showing of but-for causation. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (holding Title VII retaliation claims must be proved according to traditional principles of but-for causation, which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer"). Dr. Al-Hafnawi fails to meet the first and third prongs of the prima facie test.

As to the first element, it is undisputed that Dr. Al-Hafnawi did not engage in any statutorily protected activity before his termination. Indeed, there is no credible evidence that Dr. Al-Hafnawi submitted any complaints before his termination specifically claiming discrimination based on race, national origin, or religion. (Def.'s Stmt. at ¶ 31.) As such, Dr. Al-Hafnawi's retaliation claim fails. *See Callahan*, 2020 WL 914923, at *3, n.1 ("[The plaintiff's] opposition to [his employer's] curfew policy does not qualify as statutorily protected activity because Title VII protects only opposition to employment practices prohibited by Title VII, not illegal conduct generally.") (citing 42 U.S.C. § 2000e-3(a)); *Birdyshaw v. Dillard's Inc.*, 308 F. App'x 431, 436–37 (11th Cir. 2009) (holding that employee was not engaged in any protected activity, thus defeating a Title VII retaliation claim, based on a letter from the employee to management which "simply described harsh treatment in connection with a work-related dispute," but did not claim discrimination on account of any protected ground); *Coutu v. Martin Cty. Bd. of Cty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) (grievance did not constitute protected activity because "[u]nfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII"); *Webb v. R & B Holding Co.*, 992 F. Supp. 1382, 1389 (S.D. Fla. 1998) (King, J.) ("It is not enough for the employee merely to complain about a certain policy or certain behavior of co-workers and rely on the employer to infer that discrimination has occurred.")

As to the third prong of his prima facie case, no evidence has been presented to establish a causal connection between any of Dr. Al-Hafnawi's complaints and his termination. A plaintiff can satisfy the causation element by showing that "the decision-maker knew of the protected activity, and that a close temporal proximity existed between this awareness and the adverse employment action." *Castillo v. Roche Labs., Inc.*, 467 F. App'x 859, 862 (11th Cir. 2012); *see also Singleton v. Pub. Health Tr. of Miami-Dade Cty.*, 725 F. App'x 736, 738 (11th Cir. 2018); *Grant v. Miami-Dade Cty.*, No. 13-22008-CIV, 2014 WL 7928394, at *8 (S.D. Fla. Dec. 11, 2014) (Scola, J.)), *aff'd sub nom. Grant v. Miami-Dade Cty. Water & Sewer Dep't*, 636 F. App'x 462 (11th Cir. 2015). In the Eleventh Circuit, it is well settled that, "in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and

the adverse action, the complaint of retaliation fails as a matter of law." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). Here, Dr. Al-Hafnawi fails to establish causation for both these reasons.

First, although Dr. Al-Hafnawi may have complained to several people at the Trust about workplace issues, there is no evidence that he ever complained about unlawful discrimination to Contreras, the decision-maker responsible for his termination. (Def.'s Stmt. at ¶¶ 31-32.) It is, thus, undisputed that Contreras was unaware of any discrimination complaints before deciding to terminate him. *See Thomas v. Miami Dade Pub. Health Tr.*, 369 F. App'x 19, 23 (11th Cir. 2010) (finding a plaintiff's attempt to establish a prima facie case failed where "[t]he Trust submitted uncontroverted evidence it did not have notice or knowledge of the filing of [the plaintiff's] EEOC charge at the time of her suspension.").

Second, Dr. Al-Hafnawi's retaliation claim fails for lack of a close temporal proximity between his alleged complaints and his termination. Dr. Al-Hafnawi testified he discussed a complaint with Cecilia Gonzalez, Chief of Human Resources at Jackson South, in December 2017 or January of 2018. (Def.'s Stmt. at ¶ 33.) Yet, Dr. Al-Hafnawi was not terminated until June 29, 2018, at least five months later. (*Id.* at ¶ 34.) This five-month period is insufficient to establish a causal connection as a matter of law. *See Thomas*, 506 F.3d at 1364 (finding a three to four month disparity between the statutorily protected expression and the adverse employment action insufficient); *see also Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (finding three to four months between the protected activity and the adverse action to be too attenuated to show a causal connection absent other evidence); *Wellons v. Miami-Dade Cty.*, No. 13-20574-CIV, 2014 WL 2047779, at *17 (S.D. Fla. Feb. 25, 2014), *aff'd,* 611 F. App'x 535 (11th Cir. 2015) (Altonaga, J.) (finding a four to six month period insufficient).

Based on the foregoing, Dr. Al-Hafnawi fails to establish the first element because it is undisputed he did not engage in protected activity. He fails to establish the third element because the Trust's decision-maker had no knowledge of any protected activity before terminating him, and there is a lack of close temporal proximity between Dr. Al-Hafnawi's complaints, even if they were considered protected activity, and his termination. Accordingly, Dr. Al-Hafnawi fails to state a prima facie case of retaliation and the Trust is entitled to summary judgment on counts three and four as well.

### 4. Conclusion

In sum, Dr. Al-Hafnawi has failed to make a showing sufficient for a jury to reasonably find on his behalf with respect to any of his claims. The Court therefore **grants** the Trust's motion for summary judgment in its entirety (**ECF No. 46**).

Accordingly, the Clerk is directed to **close** this case. Any other pending motions are **denied as moot**. The calendar call set for **July 14, 2020**, and the trial set for the trial period beginning **July 20, 2020,** are **canceled**.

**Done and ordered** at Miami, Florida, on July 8, 2020.

Robert N. Scola, Jr.
United States District Judge